NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CAROLYN PRAGER,<br><br>                              Plaintiff,<br><br>              v.<br><br>LABORATORY CORPORATION OF<br>AMERICA HOLDINGS, *et al.*,<br><br>                              Defendants. | Civil Action No. 23-23413 (MAS) (JBD)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Laboratory Corporation of America Holdings's ("Defendant" or "Labcorp") Motion for Summary Judgment. (ECF No. 48.) Plaintiff Carolyn Prager ("Plaintiff" or "Prager") opposed (ECF No. 52), and Defendant replied (ECF No. 55). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Defendant's motion is granted in part and denied in part.

## I.      BACKGROUND

The Court recites only the uncontested facts necessary to contextualize the present motion.

### A.      Factual Background

#### 1.      *Plaintiff's Early Employment with Defendant*

On June 27, 2005, Labcorp hired Plaintiff as a Physician Marketing Representative in its New Jersey Sales Division. (Def.'s Statement of Facts ("DSOF") ¶ 1, ECF No. 48-1; Pl.'s Response to Def.'s Statement of Facts ("PRSOF") ¶ 1, ECF No. 52.) "Plaintiff was responsible for selling Labcorp's clinical laboratory testing and diagnostic tests to new and existing clients

(i.e., physicians, clinics, and hospitals) and servicing existing clients, in Essex County." (DSOF ¶ 2; PRSOF ¶ 2.) In 2009, Plaintiff's position changed to Senior Marketing Executive ("SME"), but her job duties remained the same. (DSOF ¶¶ 5, 6; PRSOF ¶¶ 5, 6.)

### 2. *Plaintiff's Relocation and Transfer to the Philadelphia Sales Division*

In 2017, Plaintiff relocated and joined the Philadelphia Sales Division, which was headed at the time by Kenneth Ryker ("Ryker"), Regional Manager of Business Development. (DSOF ¶¶ 7, 8; PRSOF ¶ 7, 8.) The Philadelphia Sales Division was divided into two territories: North and South. (DSOF ¶ 11; PRSOF ¶ 11.) After relocating, Plaintiff was assigned to the then-vacant North territory, which had previously been covered by a male SME. (DSOF ¶¶ 12, 13; PRSOF ¶¶ 12, 13.) In her role, Plaintiff "traveled to New Jersey less than once per month to meet with Ryker." (DSOF ¶ 18; PRSOF ¶ 18.)

At the time, Plaintiff worked with her peer Jackie Stella ("Stella"), a female SME who covered the South territory and had no supervisory authority over Plaintiff. (DSOF ¶¶ 14, 15; PRSOF ¶¶ 14, 15.) In 2018, Stella was promoted out of her SME role. (DSOF ¶ 19; PRSOF ¶ 19.) Plaintiff requested to take over the South territory, but Ryker kept Plaintiff in her existing territory and assigned the South territory to Paul Klein ("Klein"). (DSOF ¶¶ 20, 21; PRSOF ¶¶ 20, 21.) Klein had previously "worked for Labcorp as a Key Account Executive ('KAE') in the Philadelphia Sales Division, servicing both territories." (DSOF ¶ 22; PRSOF ¶ 22.) KAE was considered a more entry-level position in comparison to the SME position, as "SMEs were primarily responsible for seeking out new business for Labcorp, [but] KAEs were primarily responsible for maintaining and servicing existing business." (DSOF ¶¶ 23, 24; PRSOF ¶¶ 23, 24.)

2

### 3. *Plaintiff's Complaints about her Territory Assignment*

Plaintiff complained to Ryker that she was assigned less favorable accounts and territories. (DSOF ¶ 25; PRSOF ¶ 25.) Ryker, who did not have unilateral authority to alter territories,[1] testified that he "informed Plaintiff that he would 'look at the analysis and get some further information and also some further direction from [his] supervisor and [NSA].'"[2] (DSOF ¶¶ 26, 27 (alterations in original); PRSOF ¶¶ 26, 27.) Ryker raised Plaintiff's concerns to his supervisor, Michael Schooley, Vice President of Business Development. (DSOF ¶ 28; PRSOF ¶ 28.) Plaintiff's territory had fewer total accounts compared to the South territory, and Plaintiff was told that NSA had conducted an analysis of the territories and that a determination was made that "the North territory had the second most opportunity when compared to Plaintiff's counterparts in the Northeast Sales Division." (DSOF ¶¶ 30, 31; PRSOF ¶ 30 (admitting that "Plaintiff was told that NSA had conducted an analysis of the territories" but stating that "[Stephanie Hanshaw ('Hanshaw')] testified that she (not NSA) made the determination" (emphasis omitted)), ¶ 31.)

### 4. *Hanshaw Becomes Plaintiff's Supervisor*

In May 2020, Ryker was promoted to Associate Vice President, and Hanshaw filled Ryker's position and became Plaintiff's supervisor. (DSOF ¶¶ 37, 38; PROSF ¶¶ 37, 38.) On August 11, 2020, Hanshaw sent e-mail correspondence to Plaintiff with the subject line "Missed Opportunities." (DSOF ¶ 40; PRSOF ¶ 40.) The e-mail correspondence identified such

---

[1] Labcorp's sales territories are, at least in part, established by Labcorp's National Sales Administration Department (the "NSA"). (DSOF ¶ 10; PRSOF ¶ 10 (implicitly acknowledging that NSA is involved in establishing sales territories by noting "[i]n addition to NSA, managers are also involved in establishing sales territories").)

[2] Plaintiff does not dispute the testimony that Ryker gave but disputes this statement, and other statements from Ryker, because "Ryker's credibility has been called into question by multiple fact disputes . . . ." (PRSOF ¶ 27.)

opportunities that Plaintiff missed. (DSOF ¶ 41 (citing Ex. 5 to Barbatsuly Decl., ECF No. 49-1); PRSOF ¶ 41 (disputing Defendant's characterization that "the items addressed in Hanshaw's e[-]mail [correspondence] constituted 'failures' on Plaintiff's part[,]" but not denying contents of items listed in correspondence).)

### 5.    *Plaintiff Declines Opportunity to Take Time Off*

"On February 1, 2021, Plaintiff had a call with Hanshaw and Ryker in which she discussed that she recently experienced a bad episode of vertigo."[3] (DSOF ¶ 42; PRSOF ¶ 42.) Plaintiff had not previously requested an accommodation for her disability and instead, prior to February 2021, had used vacation time. (DSOF ¶ 44; PRSOF ¶ 44.) That same day, Hanshaw sent e-mail correspondence to Plaintiff stating, "health is very important and we want to do everything we can do [to] assist you in any way." (DSOF ¶ 45 (citing Ex. 8 to Barbatsuly Decl., ECF No. 48-11); PRSOF ¶ 45 (not disputing statement in correspondence as that "document speaks for itself[,]" but disputing fact "to the extent that this statement seeks to imply that Defendant[] did not have a discriminatory animus against disabled employees").) Hanshaw also gave Plaintiff the name of ReedGroup, "a third-party administrator that Labcorp engages to handle leave and accommodation requests." (DSOF ¶ 46; PRSOF ¶ 46.) Plaintiff did not contact ReedGroup to request any disability-related accommodation in February 2021. (DSOF ¶ 47; PRSOF ¶ 47.)

In March 2021, Plaintiff informed Hanshaw that her father was unwell. (DSOF ¶ 48; PRSOF ¶ 48.) Hanshaw spoke with Plaintiff in April 2021 about Plaintiff's expectations moving forward and communication regarding "any time off that [Plaintiff] need[s] to take." (DSOF ¶ 53; PRSOF ¶ 53 (admitting that "Hanshaw and Plaintiff spoke on April 26, 2021[,] and

---

[3] According to Plaintiff, she was diagnosed with vertigo in 2000, but the condition worsened around 2018. (DSOF ¶ 43; PRSOF ¶ 43.)

Defendant[ was] aware of Plaintiff's leaves of absence in April 2021"); Ex. 9 to Barbatsuly Decl., ECF No. 48-12).) Plaintiff testified that she subsequently reached back out to ReedGroup, but ReedGroup informed her "that she needed to know her father's plan for discharge from the hospital before ReedGroup could approve time off to care for her father." (DSOF ¶ 56; PRSOF ¶ 56.) Plaintiff was therefore advised to reach back out to ReedGroup upon learning of her father's discharge plans. (DSOF ¶ 57; PRSOF ¶ 57.) Plaintiff did not reach back out to ReedGroup, however, and instead "used her paid time off whenever she needed to take time off to care for her father, which was always approved." (DSOF ¶ 58; PRSOF ¶ 58 (noting that it is "undisputed that Plaintiff testified as described").) During this time, clients lodged complaints about Plaintiff's responsiveness. (DSOF ¶ 59 (first citing Ex. 10 to Barbatsuly Decl., ECF No. 49-4; then citing Ex. 7 to Barbatsuly Decl., ECF No. 49-3; and then citing Ex. 2 to Hanshaw Decl., ECF No. 49-13); PRSOF ¶ 59 (not denying existence of complaints, but disputing the fact to the extent that: (1) it "suggests that Hanshaw documented performance coaching for Plaintiff prior to placing Plaintiff on a [Performance Improvement Plan ('PIP')]"; (2) "these criticisms were legitimate"; and (3) the criticisms "led Defendant[] to believe, at the time, that Plaintiff had 'performance deficiencies'").)

### 6.    *Plaintiff Misses Sales Quotas*

Plaintiff also repeatedly missed her sales quotas in 2021.[4] (DSOF ¶ 61; PRSOF ¶ 61 (noting that it is "[u]ndisputed that Plaintiff along with nearly every other SME missed sales quotas in 2021").) Hanshaw met with Plaintiff on November 8, 2021, where "Hanshaw noted that Plaintiff had fallen short of her $8,000 quota for three of the four most recent months (June, August, and September) for which sales data was then available." (DSOF ¶¶ 64, 65; PRSOF ¶¶ 64, 65.) During

---

[4] Throughout Plaintiff's employment, SMEs in the Northeast Sales Division had an $8,000 per month new sales revenue quota. (DSOF ¶ 62; PRSOF ¶ 62.)

the meeting, Hanshaw also discussed "coming up with a target list of potential new revenue sources to help Plaintiff meet her goals." (DSOF ¶ 66; PRSOF ¶ 66.) Ryker testified that "[i]t was Labcorp's practice in the Northeast Sales Division that any SME who missed their revenue quota for three consecutive months would receive a pre-PIP discussion[,]" and if a fourth month was missed, "the SME's manager would prepare a PIP in consultation with Labcorp's Employee Relations Department ('Employee Relations')." (DSOF ¶¶ 68, 69; PRSOF ¶¶ 68, 69 (admitting that Ryker testified to this but calling into question his credibility).)

In December 2021, Labcorp announced that it was changing the criteria by which all SMEs in the Northeast Sales Division were measured. (DSOF ¶ 72; PRSOF ¶ 72.) While SMEs were previously "evaluated on both their existing book of business (attainment) and new revenue (new sales)[,]" moving forward, "SMEs would only be assessed on their new revenue growth (with a[n] $8,000 monthly quota)." (DSOF ¶¶ 73, 74; PRSOF ¶¶ 73, 74.) Moreover, SMEs were also now required to "submit call-ins to Salesforce for the upcoming month by the last day of the past month." (DSOF ¶ 76; PRSOF ¶ 76.) Plaintiff, however, did not timely submit her call-ins for December 2021 or January 2022. (DSOF ¶ 77; PRSOF ¶ 77 ("Undisputed that Plaintiff delayed submission of her call-ins because of pending questions regarding the new performance metrics and need for clarification from Hanshaw.").)

### 7.    *Plaintiff's PIP*

In January 2022, Plaintiff was placed on a PIP. (DSOF ¶¶ 79, 80; PRSOF ¶ 79 (disputing fact regarding "who was involved with the decision to place Plaintiff on a PIP[,]" but not disputing that Plaintiff was placed on a PIP), ¶ 80.) The PIP was scheduled to last ninety days. (DSOF ¶ 81; PRSOF ¶ 81 (disputing when the PIP started, but not that it would last for ninety days).) The PIP required Plaintiff to:

6

> (1) develop and execute a comprehensive 30-60-90 day marketing plan; (2) hit her monthly new sales quota of $8,000 per month for each month of the PIP; (3) demonstrate knowledge of, and ability to use, technology, such as Salesforce; (4) comply with administrative requirements, including logging all client facing sales visits daily and responding to all client emails/calls within 24 hours; and (5) attend a minimum of five calls with Hanshaw/Ryker in the first 30-day period and five additional calls in the next 30 day period.

(DSOF ¶ 82 (citing Ex. 15 to Barbatsuly Decl., ECF No. 48-18); PRSOF ¶ 82 (admitting that PIP "list[ed] these requirements" but disputing "that these requirements were reasonable, fair, or previously mandated").) Hanshaw explained that "Plaintiff's employment would be terminated if she failed to achieve the goals of the PIP." (DSOF ¶ 83; PRSOF ¶ 83.)

### 8.    *Plaintiff Contacts Employee Relations and Takes Leave*

On February 14, 2022, Plaintiff contacted Judi Ahrikenchikh ("Ahrikenchikh") regarding her concerns, stating that she felt "undervalued." (DSOF ¶ 84 (quoting Ex. 16 to Barbatsuly Decl., ECF No. 48-19); PRSOF ¶ 84 (admitting that Plaintiff sent the mentioned e-mail correspondence "to complain of discrimination as described").) Plaintiff then spoke with Ahrikenchikh on February 16, 2022, and sent two follow-up e-mail correspondences later that evening. (DSOF ¶ 85; PRSOF ¶ 85.) At 5:17 p.m. that evening, Plaintiff emailed Ahrikenchikh regarding her performance, mentioning that she felt "targeted" and inquiring about the "other underperforming SMEs" in this subdivision[5] and noting that Ryker gave the Philadelphia SME position to a male KAE even though Plaintiff asked if she could apply for the position. (DSOF ¶¶ 86, 87 (citing Ex. 17 to Barbatsuly Decl., ECF No. 49-8); PRSOF ¶¶ 86, 87 (not disputing that Plaintiff sent the email).) In her second email to Ahrikenchikh, Plaintiff referenced "discussions she had with Ryker

---

[5] The "other underperforming SMEs" that Plaintiff identified included both male and female colleagues. (DSOF ¶ 88; PRSOF ¶ 88.)

in 2019 regarding her request that Ryker add additional zip codes to her sales territory." (DSOF ¶ 89 (citing Ex. 18 to Barbatsuly Decl., ECF No. 48-21); PRSOF ¶ 89.)

Plaintiff subsequently requested a leave of absence for her own medical condition pursuant to the Family and Medical Leave Act (the "FMLA"), and was on leave from February 17, 2022, to May 9, 2022. (DSOF ¶¶ 95, 96; PRSOF ¶¶ 95, 96.) "Plaintiff testified that she was not hospitalized during this leave period but saw physicians for her various medical conditions as she was 'finally taking care of [her]self and taking care of [her] disabilities.'" (DSOF ¶ 97; PRSOF ¶ 97.)

### 9.   *Plaintiff Returned to Work*

On May 9, 2022, Plaintiff returned to work. (DSOF ¶ 98; PRSOF ¶ 98.) Sometime after she returned to work, her PIP was restarted. (DSOF ¶ 99; PRSOF ¶ 99 (disputing timing of when PIP restarted, but admitting that "[a] second PIP document, signed by Plaintiff on September 6, 2022, was backdated to July 1, 2022").) Meanwhile, on June 1, 2022, Hanshaw began maternity leave. (DSOF ¶ 102; PROSF ¶ 102.) During Hanshaw's maternity leave, Plaintiff reported to Ryker. (DSOF ¶ 102; PRSOF ¶ 102.)

On August 17, 2022, Ryker sent Plaintiff e-mail correspondence noting that Plaintiff's July new sales revenue was -$185 and that Plaintiff had not logged any calls in Salesforce since June. (DSOF ¶ 107 (citing Ex. 20 to Barbatsuly Decl., ECF No. 49-10); PRSOF ¶ 107 (not disputing contents of the e-mail correspondence, but disputing "any implication that the goals of the PIP, including the new sales revenue quota, were nondiscriminatory and/or nonretaliatory, realistic to achieve, and accurately reflected the expected job responsibilities for SMEs").) Around this time, Klein voluntarily resigned from his position, leaving the South territory vacant. (DSOF ¶ 108;

8

PRSOF ¶ 108.) Sometime thereafter, David Marshall ("Marshall") was hired to replace Klein as SME in the Philadelphia Sales Division covering the South territory. (DSOF ¶ 131; PRSOF ¶ 131.)

In late July 2022, Plaintiff met with Carl Epple[6] ("Epple") at his office in New Castle, Delaware. (DSOF ¶ 111; PRSOF ¶ 111.) Plaintiff testified that in that meeting she reiterated that the PIP was "targeted, unfair[,] and unattainable." (DSOF ¶ 112; PRSOF ¶ 112.) Following the meeting, Epple sent e-mail correspondence to Ahrikenchikh regarding the meeting. (DSOF ¶ 117 (citing Ex. 21 to Barbatsuly Decl., ECF No. 49-11); PRSOF ¶ 117 (disputing characterization of e-mail correspondence, but not the fact that Epple sent such correspondence).) Thereafter, Plaintiff's July and August 2022 new sales revenue was again well below the $8,000 requirement. (DSOF ¶ 119 (citing Ex. 11 to Hanshaw Decl., ECF No. 48-50); PRSOF ¶ 119 (disputing "any implication that the new sales revenue generated in July and August 2022 is an accurate reflection of her performance and ability to generate revenue" but not disputing the underlying fact).) Moreover, Plaintiff: (1) did not submit a single travel and expense report during the PIP; (2) only logged two Salesforce visits in August, and none in either July or September; and (3) failed to timely respond to clients. (DSOF ¶ 124; PRSOF ¶ 124 (not disputing the underlying facts regarding Plaintiff's actions or inactions).)

### 10.    *Plaintiff's Termination*

In September 2022, Hanshaw reached out to Mark Musser ("Musser") in Employee Relations to discuss terminating Plaintiff. (DSOF ¶ 125; PRSOF ¶ 125.) Hanshaw's termination request was approved on November 17, 2022. (DSOF ¶ 126 (citing Ex. 34 to Barbatsuly Decl., ECF No. 48-37); PRSOF ¶ 126.) In the meantime, in late September, Plaintiff requested a second

---

[6] While the DSOF and PRSOF do not detail Epple's role, the Second Amended Complaint (the "SAC") alleges that Epple was the "Vice President Southern Subdivision." (SAC ¶ 39, ECF No. 19.)

9

leave of absence, which was later approved by ReedGroup as of November 1, 2022. (DSOF ¶¶ 127, 128; PRSOF ¶¶ 127, 128.) Labcorp communicated the termination decision to Plaintiff on January 4, 2023, the day Plaintiff returned from her leave. (DSOF ¶ 129; PRSOF ¶ 129.)

## B.    Procedural Background

Plaintiff initially filed suit in December 2023. (Compl., ECF No. 1.) After the named defendants filed a motion to dismiss (Mot. to Dismiss, ECF No. 9), Plaintiff filed an Amended Complaint (Am. Compl., ECF No. 13). Thereafter, Plaintiff sought leave to file the SAC (Pl.'s Mot. for Leave to File SAC, ECF No. 17), which this Court granted (Apr. 29, 2024, Text Order, ECF No. 18). On April 29, 2024, Plaintiff filed the operative SAC alleging violations of: (1) Title VII of the Civil Rights Act ("Title VII") ("Count One"); (2) the Americans with Disabilities Act (the "ADA") ("Count Two"); (3) the FMLA ("Count Three"); (4) the New Jersey Law Against Discrimination (the "NJLAD") ("Count Four"); (5) the New Jersey Family Leave Act (the "NJFLA") ("Count Five"); (6) the Pennsylvania Human Relations Act (the "PHRA") ("Count Six"); and (7) the Philadelphia Fair Practices Ordinance ("PFPO") ("Count Seven"). (*See generally* SAC.) On May 28, 2024, Labcorp[7] answered the SAC. (Answer, ECF No. 22.)

After the parties completed discovery, Labcorp filed the instant motion for summary judgment, asking this Court to dismiss Plaintiff's Complaint in its entirety with prejudice. (*See generally* Def.'s Moving Br.) Plaintiff opposed the instant motion (*see generally* Pl.'s Opp'n Br., ECF No. 52), and Defendant replied (*see generally* Def.'s Reply Br., ECF No. 55).

---

[7] The Court notes that, although the SAC named "Labcorp" and "Lab. Cor. of America Holdings" as defendants (*see generally* SAC), Defendant has represented that "[t]here are no legal entities with those names as pled" (Def.'s Moving Br. 1, ECF No. 48-2). As a result, the Court treats Defendant as the sole defendant in this matter.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a)[8] provides that summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). A material fact raises a genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248). In deciding a summary judgment motion, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the moving party has met its threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 247-48; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which the nonmoving party must rely to support its assertion that genuine disputes of material fact exist). If the non-moving party fails to come forward with the requisite showing to establish "the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial[,]" then "there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the non[-]moving party's case necessarily renders all other facts

---

[8] Any reference to "Rule" or "Rules" hereinafter refers to the Federal Rules of Civil Procedure.

immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249-50. Credibility determinations are the province of the fact finder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

## III.   DISCUSSION

Defendant moves for summary judgment, arguing that Plaintiff's Complaint against Defendant should be dismissed in its entirety. (*See generally* Def.'s Moving Br.) The Court addresses each Count in turn.

### A.   Count One (Title VII)

Plaintiff brings discrimination, retaliation, and hostile work environment claims under Title VII alleging that a less qualified male employee (Klein) was promoted over her and that she was placed on a PIP and terminated on the basis of her sex. (*See* SAC ¶¶ 44-57, 83, 88, 89, 121, 142-43.) The Court first turns to Plaintiff's Title VII discrimination claim.

#### 1.   *Discrimination*

Plaintiff's Title VII discrimination claim is analyzed pursuant to the *McDonnell Douglas* burden-shifting test. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 80205 (1983); *see also Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (applying burden-shifting framework to Title VII discrimination claim). First, Plaintiff must establish a prima facie case of

12

discrimination. *McDonnell Douglas*, 411 U.S. at 802. To make a prima facie case of discrimination under Title VII, Plaintiff must show that: "(1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). "The burden to establish a prima facie case is 'not onerous.'" *Wills v. CulinArt Grp.*, 814 F. Supp. 3d 535, 545 (D.N.J. 2026) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 245, 253 (1981)). "Its requirements are flexible, and courts 'must be sensitive to the myriad of ways' an inference of unlawful discrimination can arise." *Id.* (quoting *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347-48 (3d Cir. 1990)).

If Plaintiff establishes her prima facie case, then the burden shifts to Labcorp, as the employer, to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If Defendant meets this burden, then Plaintiff must "provide evidence from which a factfinder could reasonably infer that [Labcorp's] proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (citation omitted).

### a.    *Plaintiff Establishes a Prima Facie Case*

Here, Defendant only takes issue with the fourth prima facie element, arguing that: (1) "Plaintiff does not identify any similarly situated male employees who were treated more favorably than she was"; and (2) "after Plaintiff's employment was terminated in January 2023, Plaintiff's counterpart in the Philadelphia Sales Division, Marshall, took over Plaintiff's former sales territory and a female employee, Lisa O'Brien ('O'Brien'), was promoted from KAE to SME to fill the vacancy that Plaintiff's termination caused" which "further negat[es] any inference of discrimination." (Def.'s Moving Br. 20-21 (citations omitted).) Plaintiff, however, relies on

13

various pieces of evidence to show that her lack of promotion, termination, and/or placement on a PIP[9] occurred under circumstances giving rise to an inference of sex discrimination including that: (1) there were no females in Ryker's direct reporting structure (Pl.'s Statement of Additional Facts ("PSOF") ¶ 7, ECF No. 52; Def.'s Response to Pl.'s Statement of Additional Facts ("DRSOF") ¶ 7, ECF No. 55-7); (2) Ryker promoted Klein, a male individual with less than a year of experience with Labcorp, to fill a vacancy that Plaintiff had asked Ryker if she could apply for (PSOF ¶¶ 11, 12; DRSOF ¶¶ 11, 12); and (3) upon Plaintiff's termination, Marshall, a male employee, was given the choice to (and did) select Plaintiff's former territory or to remain in his coverage of Klein's former territory[10] (PSOF ¶¶ 177, 178; DRSOF ¶¶ 177, 178). (*See* Pl.'s Opp'n Br. 10-11.) The Court finds that Plaintiff has identified facts that a reasonable juror could find show circumstances supporting an inference of discrimination, and thus has met her "not onerous" burden to establish a prima facie case of discrimination. *See Wills*, 814 F. Supp. 3d at 545, 547-48.

**b.    *A Reasonable Jury Could Find Defendant's Proffered Reason for the Termination to be Pretext***

Because Plaintiff has established her prima facie case, the burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802. Here, Defendant states that it "terminated Plaintiff's employment for the legitimate, non-discriminatory reason that Plaintiff failed to meet the requirements for continued employment stated in her PIP." (Def.'s Moving Br. 22, 23.)

---

[9] The Court notes that, from its review of the SAC, Plaintiff alleges discrimination stemming from these various events. (*See* SAC ¶¶ 44-57, 83, 88, 89, 121, 142-43.)

[10] The Court notes that Plaintiff was directly replaced by a male, Marshall, after her termination. (*See* PSOF ¶ 178; DRSOF ¶ 178.) This alone may establish an inference of discrimination, *see Johnson v. Keebler-Sunshine Biscuits, Inc.*, 214 F. App'x 239, 242 (3d Cir. 2007), as a subsequent hiring decision (i.e., hiring O'Brien to fill a vacancy created from Marshall's shift to cover Plaintiff's old territory) "cannot retroactively sanitize an earlier discrimination termination[,]" *Wills*, 814 F. Supp. 3d at 545.

14

As a result, the burden then shifts back to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either[:] (1) disbelieve [Defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [Defendant's] action.'" *Burton*, 707 F.3d at 426 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). If Plaintiff "has pointed to evidence sufficiently to discredit . . . [D]efendant's proffered reasons, . . . [P]laintiff need not also come forward with additional evidence of discrimination beyond . . . her prima facie case." *Fuentes*, 32 F.3d at 764 (citations omitted)).

Here, Plaintiff has identified conflicting testimony from Defendant's employees regarding who was involved with the decision to terminate Plaintiff and who was involved in the decision to implement the second backdated PIP, as well as conflicting evidence about the timing of the second PIP. (*See* PSOF ¶¶ 115-16, 118-19, 121-23, 162-64, 166; DRSOF ¶¶ 115-16, 118-19, 121-23, 162-64, 166.) Such "[s]hifting explanations for an employment action is one of the strongest types of evidence of pretext." *Arpajian v. Prop. Sols., Inc.*, No. 03-4666, 2005 WL 2000172, at *10 (D.N.J. Aug. 16, 2005) (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)).

Moreover, Plaintiff presented evidence that by at least some metric, she was not objectively the worst SME during the relevant timeframe, and yet other SMEs were not placed on a PIP. (PSOF ¶¶ 66, 67; DRSOF ¶¶ 66, 67.) Additionally, Plaintiff presented evidence that during the three-year period leading up to Plaintiff's termination, Ryker testified that he did not recall any other sales representatives reporting to him being placed on a PIP. (PSOF ¶ 175; DRSOF ¶ 175.) Given that the "evidence shows the sort of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Labcorp's] proffered legitimate reasons for its action[, the Court finds] that a reasonable factfinder *could* rationally find [Labcorp] unworthy of credence." *Cullen v. Select Med.*

*Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019) (emphasis in original) (quotation marks omitted) (quoting *Fuentes*, 32 F.3d at 765).

The Court, accordingly, denies Defendant's motion for summary judgment as to Plaintiff's Title VII discrimination claim.

### 2.   *Retaliation*

The Court next turns to Plaintiff's Title VII retaliation claim, which is also subject to the *McDonnell Douglas* framework. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-42 (3d Cir. 2006).

To establish a Title VII prima facie case of retaliation, Plaintiff "must show that: (1) . . . she engaged in a protected activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Wills*, 814 F. Supp. 3d at 550 (quoting *Perry v. Harvey*, 332 F. App'x 728, 732 (3d Cir. 2009)). "The Third Circuit has made clear that a 'general complaint of unfair treatment is insufficient to establish protected activity under Title VII.'" *Id.* (quoting (*Curay-Cramer v. Ursuline Acad. of Wilmington, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006)).

Here, Defendant argues that Plaintiff has not shown that she has engaged in protected activity or that a causal link exists between her protected activity and the adverse action. (*See* Def.'s Moving Br. 27-30.) As Defendant contends (*see id.* at 29), and the Court agrees, the February 2022 e-mail correspondence with Ahrikenchikh that Plaintiff identified in her SAC only vaguely mentions that Ryker denied Plaintiff the opportunity for the requested Philadelphia SME territory because "[h]e said he already chose the replacement and he gave the position to a male KAE who had only been with the company less than 6 months." (Exs. 17, 18 to Barbatsuly Decl.) The e-mail correspondence otherwise contains no complaints of sex discrimination. (*See id.*)

16

Plaintiff argues in opposition, though, that she "was not required to make a complaint using the words 'sex discrimination' . . . with 'any heightened level of specificity', or refer to 'magic words.'" (Pl.'s Opp'n Br. 18-19 (emphasis omitted) (citations omitted).) Rather, Plaintiff points to, without citing directly to *any* of the evidence in the record: (1) "[r]epeated complaints about territory imbalances and less favorable treatment compared to male employees" from 2019 to 2021; (2) a complaint in November 2021 to Hanshaw "about being assigned less lucrative accounts and territories than Klein"; (3) complaints to Ahrikenchikh from February 2022 about "sex discrimination, unfair PIP, Ryker's failure to promote her, [and] failure to address territory complaints" as well as a February 16, 2022 e-mail correspondence to Ahrikenchikh "citing lack of uniform process, discriminatory evaluation of her quota, [and] feeling 'targeted'"; (4) a May 2022 complaint that "Ryker was disclosing her confidential complaints and PIP status, retaliating against her"; (5) a May 31, 2022, complaint to Epple "about discrimination and retaliation"; and (6) June 6, 2022, "written complaints to Ahrikenchikh and Epple documenting discrimination, retaliation, and bullying." (Pl.'s Opp'n Br. 19.)

"It is not the Court's responsibility to sift through the record—let alone a voluminous record like the one here—to find evidence supporting Plaintiff's position." *Dor v. TD Bank*, No. 21-18955, 2023 WL 9017558, at *10 (D.N.J. Dec. 29, 2023) (citations omitted); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("Judges are not like pigs, hunting for truffles buried in the record." (quotation marks and citation omitted)); *United States v. Dentsply Int'l, Inc.*, No. 12-7199, 2016 WL 1403991, at *1 (E.D. Pa. Apr. 11, 2016) ("In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties." (citing Fed. R. Civ. P. 56(c)(3))). Here, Plaintiff's vague arguments relating to various "complaints" are not supported by

17

citations to the record, and as such, the Court cannot substantiate Plaintiff's arguments.[11] The Court also finds that the two e-mail correspondences to Ahrikenchikh containing general complaints (*see* Exs. 17, 18 to Barbatsuly Decl.) do not constitute protected activity, *see Wills*, 814 F. Supp. 3d at 550 (noting that "a 'general complaint of unfair treatment is insufficient to establish protected activity under Title VII'" (quoting *Curay-Cramer*, 450 F.3d at 135).

The Court, therefore, grants Defendant's motion for summary judgment as to Plaintiff's Title VII retaliation claim. Plaintiff's Title VII retaliation claim is dismissed with prejudice.

### 3.    *Hostile Work Environment*

The Court next turns to Plaintiff's hostile work environment claim brought pursuant to Title VII.

"To succeed on a hostile work environment claim under Title VII, . . . [P]laintiff must establish that: (1) . . . she suffered intentional discrimination because of . . . her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected . . . [P]laintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability." *Wills*, 814 F. Supp. 3d at 550 (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

---

[11] From what the Court can discern without citations from Plaintiff indicating the factual evidence her argument relies upon, though, the complaints that Plaintiff generally lists do not include complaints of sex discrimination. For example, Plaintiff's: (1) complaint in November 2021 to Hanshaw "about being assigned less lucrative accounts and territories than Klein" appears to solely be about the fact that her territory had lower revenue, and not about sex discrimination (*see* PSOF ¶¶ 13-16); and (2) May 31, 2022, complaint to Epple "about discrimination and retaliation" related to a complaint that the PIP was generally "targeted, unfair and unattainable[,]" but Plaintiff did not otherwise tie the complaints about her PIP to feelings of gender discrimination (*id.* ¶ 105).

18

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (quotation marks and citation omitted). "For discrimination to constitute severe or pervasive behavior, it must 'alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "The Supreme Court has emphasized that 'conduct must be extreme' to satisfy this standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Defendant argues that Plaintiff has not met her burden in showing that her work environment was hostile. (Def.'s Moving Br. 34-35.) In opposition, Plaintiff contends that: (1) "[a] reasonable jury could . . . conclude that Plaintiff suffered intentional discrimination and that the totality of the circumstances constitute severe or pervasive harassment"; (2) the evidence in the record shows that Plaintiff, "a disabled female who had complained of discrimination and retaliation" was the only employee to be placed on a PIP and terminated; and (3) after Plaintiff was terminated, the evidence shows that "Defendant[] treated a male, non-disabled, and non-complaining employee more favorably[.]" (Pl.'s Opp'n 31-32.)

Here, the Court finds that Plaintiff's hostile work environment claim under Title VII fails because there are no facts in the record to show the required "severe or pervasive" conduct to establish that the workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). Rather, the Court notes that Plaintiff testified that Ryker "rule[d] by fear[,]" and that Ryker's conduct was directed to all of his direct reports. (*Id.* at 35 (citing DSOF ¶ 9); *see*

19

*also, e.g.*, Ex. 2 to Barbatsuly Decl. 230:10-15 ("Q. All right. But, that just wasn't directed to you, that was directed to . . . all of his direct reports, right? A. Correct. The only reason . . . I included it is because I was telling her about the fear instilled."), ECF No. 48-5); *see Connell v. Nicholson*, 318 F. App'x 75, 78 (3d Cir. 2009) ("Even the incidents in which [the named employee] harassed only men fail to show that she harassed them on the basis of their sex. [The employee's] behavior, while clearly inappropriate, was apparently motivated by nothing more than difficult relationships and a generally hostile disposition towards coworkers, without regard to gender.").

Moreover, the only other conduct that Plaintiff identifies in opposition to Defendant's motion relates to the decision to place Plaintiff on a PIP and ultimately terminate her. (*See* Pl.'s Opp'n Br. 31-32 (citing PSOF ¶¶ 96-101, 171-76, 178).) Plaintiff otherwise does not identify any other physically threatening, humiliating, or abusive conduct that could meet the threshold required. (*See generally id.*); *see also Faragher*, 524 U.S. at 788 ("The[] standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"); *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 421-22 (D.N.J. 2009) ("An unpleasant workplace does not constitute a hostile work environment . . . if the difficult conditions result from something other than discrimination based upon a characteristic or activity protected by Title VII. . . . The critical inquiry . . . is therefore whether [p]laintiff was subjected to *pervasively abusive conditions* . . . ." (emphasis added)). Here, Plaintiff files to cite sufficient record evidence to satisfy the "severe or pervasive" standard.

The Court, therefore, grants Defendant's motion for summary judgment as to Plaintiff's Title VII hostile work environment claim. Plaintiff's Title VII hostile work environment claim is dismissed with prejudice.

## B.   Count Two (ADA)

Plaintiff brings discrimination, retaliation, and hostile work environment claims under the ADA alleging that Plaintiff was placed on a PIP and terminated because of her disability. (*See* SAC ¶¶ 62-65, 83, 115, 117, 121, 126-27, 131, 133, 142-43.) The Court first turns to Plaintiff's ADA discrimination claim.

### 1.   *Discrimination*

Plaintiff's ADA discrimination claim is also subject to the *McDonnell Douglas* burden-shifting test. *Fowler v. AT&T, Inc.*, 19 F.4th 292, 298-99 (3d Cir. 2021) (applying burden-shifting framework to ADA discrimination claim). Under step one, Plaintiff "must show that she: (1) has a disability[;] (2) is a qualified individual[;] and (3) has suffered an adverse employment action because of that disability." *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 236-37 (3d Cir. 2016) (quotation marks and citation omitted).

#### a.   *Plaintiff Establishes a Prima Facie Case*

Here, Labcorp argues that "even assuming . . . that Plaintiff had a disability under the ADA and was otherwise qualified to perform her job duties, her prima facie case still fails because she cannot show that she suffered an adverse employment action 'because of' her disability – the third element of her prima facie case." (Def.'s Moving Br. 22 (emphasis omitted).) Plaintiff opposes, arguing that certain undisputed record evidence "easily supplies a logical inference of disability discrimination[,]" including: (1) Plaintiff's own testimony, which Defendant disputes, that "[p]rior to disclosing her disabilities to Defendant[], Plaintiff received [fifteen] years' worth of positive performance reviews and glowing feedback on her performance" (PSOF ¶ 5; DRSOF ¶ 5); (2) Plaintiff's own testimony that "Ryker had complained to her about disabled employes, 'badmouthing' another employee's diagnosis, complaining about how the employee was always

21

out on FMLA [leave], and was a 'weak link'" (PSOF ¶ 31; DRSOF ¶ 31); (3) the day Plaintiff returned from medical leave related to her disabilities, she was terminated (PSOF ¶ 158; DRSOF ¶ 158); and (4) Ahrikenchikh testified that she "was not aware of any accommodations that Defendant[] considered for Plaintiff, including moving her to a different position at Defendant[] in lieu of termination" despite Defendant being aware of Plaintiff's health issues (PSOF ¶¶ 140, 142; DRSOF ¶¶ 140, 142). (Pl.'s Opp'n Br. 6-10.)

The Court agrees with Plaintiff that based on the facts in the record, "a reasonable jury *could* conclude that Defendant[] viewed Plaintiff as a 'weak link' because of her disabilities, set her up to fail by issuing unreasonable PIPs that did not account for her medical leave, and terminated her because of her disability."[12] (*Id.* at 10 (emphasis added).) As such, the Court finds that Plaintiff has satisfied her "not onerous" burden for establishing the prima facie case for her ADA claim. *Fitzgerald v. Glenn Ins., Inc.*, No. 20-14891, 2023 WL 2728818, at *8 (D.N.J. Mar. 31, 2023); *see also Jackson v. Trump Ent. Resorts, Inc.*, 149 F. Supp. 3d 502, 510 (D.N.J. 2015) ("Given the timing of [plaintiff's] termination relative to his request for an ultimately unapproved accommodation, the temporal proximity between the protected activity and the adverse action is 'unusually suggestive' and is sufficient standing alone to create an inference of causality and defeat summary judgment."); *Boles v. Wal-Mart Stores, Inc.*, No. 12-1762, 2014 WL 1266216, at *13 (D.N.J. Mar. 26, 2014) (noting that summary judgment was not appropriate where "there [were] genuine [disputes] of material fact as to whether [p]laintiff was terminated because of his disability").

---

[12] The Court notes that it will not address the first two factors of the test (i.e., whether Plaintiff has a disability under the ADA and whether Plaintiff was otherwise qualified to perform her job duties), as Defendant does not argue that Plaintiff cannot meet those two prongs. (*See generally* Def.'s Moving Br.)

### b.    *A Reasonable Jury Could Find Defendant's Proffered Reason for the Termination to be Pretext*

Because Plaintiff has established her prima facie case, the burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802. Here, as already noted above, Defendant states that it "terminated Plaintiff's employment for the legitimate, non-discriminatory reason that Plaintiff failed to meet the requirements for continued employment stated in her PIP." (Def.'s Moving Br. 22-23.)

As this Court has already analyzed with respect to Plaintiff's Title VII claim, Plaintiff has identified facts in the record, including conflicting testimony about Plaintiff's PIP, evidence that by at least some metric she was not the worst SME, and a lack of history of placing other SMEs that reported to Ryker on a PIP. (*See, e.g.*, PSOF ¶¶ 66, 67, 115-16, 118-19, 121-23, 162-64, 166, 175; DRSOF ¶¶ 66, 67, 115-16, 118-19, 121-23, 162-64, 166, 175.) This is enough to create a genuine dispute of material fact that precludes summary judgment on Plaintiff's ADA discrimination claim. *See, e.g.*, *Arpajian*, 2005 WL 2000172, at *10 ("Shifting explanations for an employment action is one of the strongest types of evidence of pretext." (citation omitted)); *Cullen*, 779 F. App'x at 932 (Because "evidence shows the sort of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action[, the Court finds] that a reasonable factfinder *could* rationally find [defendant] unworthy of credence." (emphasis in original) (quotation marks and citation omitted)).

The Court, accordingly, denies Defendant's motion for summary judgment as to Plaintiff's ADA discrimination claim.

### 2.    *Retaliation*

The Court next turns to Plaintiff's ADA retaliation claim, which is also subject to the *McDonnell Douglas* framework. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d

23

Cir. 2022). As a result, Plaintiff must establish a prima facie case by showing that she: (1) engaged in a protected activity; (2) the employer took an adverse action after or contemporaneous with that activity; and (3) there is a causal connection between the two. *Id.*

In the context of her ADA retaliation claim, Plaintiff argues that "[i]t is undisputed that Plaintiff engaged in protected activity by requesting medical leave to attend doctors' appointments and treatments in connection with her disabilities[.]" (Pl.'s Opp'n Br. 18 (citing PSOF ¶¶ 142-47).) Here, the record shows that Plaintiff took FMLA leave and was terminated immediately upon returning from that leave. (*See* DSOF ¶ 129; PRSOF ¶ 129); *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 95 (3d Cir. 2020) (noting that plaintiff's "closest-in-time protected activity to her termination was her FMLA leave"). The proximity of the leave and Plaintiff's termination is sufficient for Plaintiff to meet her burden of establishing the causal connection, and thus establishing a prima facie case here. *See, e.g.*, *Wright*, 822 F. App'x at 94 ("In certain narrow circumstances, an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." (quotation marks omitted) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).

As noted above in the context of the Court's analysis on Plaintiff's Title VII and ADA discrimination claims, although Defendant has articulated a legitimate, non-discriminatory reason, Plaintiff has presented evidence that "paint[s] [Defendant's articulated reasons] as weak, implausible, contradictory, or incoherent." *Canada*, 49 F.4th at 347 (quotation marks and citation omitted). Because Plaintiff "makes this showing, summary judgment is improper because . . . [P]laintiff has raised 'a factual [dispute] regarding the employer's true motivation for discharge.'" *Id.* (citation omitted).

24

The Court, accordingly, denies Defendant's motion for summary judgment as to Plaintiff's ADA retaliation claim.

### 3.   *Hostile Work Environment*

> Much like the standard for a hostile work environment claim outlined above in connection with Title VII, "[t]o succeed on a claim for . . . hostile work environment under the ADA . . . , a plaintiff must show . . . that 'the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive working environment.'"

*Cuevas v. Camden Iron & Metal, Inc.*, No. 23-20830, 2025 WL 2490544, at *8 (D.N.J. Aug. 29, 2025) (first alteration in original) (quoting *Vanhook v. Cooper Health Sys.*, No. 21-2213, 2022 WL 990220, at *4 (3d Cir. Mar. 31, 2022)).

For the reasons discussed above in the context of Plaintiff's Title VII hostile work environment claim, Plaintiff's ADA hostile work environment claim also fails. Specifically, there are no facts in the record to show the required "severe or pervasive" conduct to establish that the workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Harris*, 510 U.S. at 21 (citations omitted). Rather, Plaintiff's own testimony acknowledged that Ryker's conduct was directed to all direct reports, and not just her, and the only other conduct Plaintiff identified was Defendant's decision to place her on a PIP and ultimately terminate her. (Ex. 2 to Barbatsuly Decl. 230:10-15; Pl.'s Opp'n Br. 31-32 (citing PSOF ¶¶ 96-101, 171-76, 178).) This is insufficient to establish the physically threatening, humiliating, or abusive conduct required to sustain a hostile work environment claim. *See Connell*, 318 F. App'x at 78; *Faragher*, 524 U.S. at 788; *McKinnon*, 642 F. Supp. 2d at 421-22.

25

The Court, therefore, grants Defendant's motion for summary judgment as to Plaintiff's ADA hostile work environment claim. Plaintiff's ADA hostile work environment claim is dismissed with prejudice.

### C.   Count Three (FMLA)

Plaintiff brings her FMLA claim alleging discrimination, retaliation, and hostile work environment.[13] The Court notes that the *"McDonnell Douglas* burden-shifting framework applies to FMLA discrimination [and retaliation] claims." *Fitzgerald v. Shore Mem. Hosp.*, 92 F. Supp. 3d 214, 232 (D.N.J. 2015) (citations omitted). Once again, Plaintiff must first establish her prima facie case of discrimination or retaliation, which requires in the FMLA context that Plaintiff show that: "(1) she availed herself of a protected right under the FMLA; (2) she was subject to an adverse employment decision; and (3) there is a causal link between the protected activity and the subsequent adverse job action." *Id.* (citing *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998)).

Defendant argues that it is entitled to summary judgment on Plaintiff's FMLA claim because Plaintiff "cannot demonstrate that her termination was causally related to her FMLA leave—the third element of her prima facie case[,]" in part because: (1) "Plaintiff was placed on a PIP *before* she took FMLA leave between February 17 and May 9, 2022"; (2) following her leave, Defendant "afforded [Plaintiff] more than seven weeks to re-acclimate to her position before re-starting the PIP, effective July 1, 2022"; and (3) "even after being given a fresh opportunity to

---

[13] Although Plaintiff's SAC initially raised a hostile work environment claim pursuant to FMLA, such a claim is not recognized. *See, e.g., Hilton v. Home Depot, Inc.*, No. 20-5145, 2022 WL 837207, at *3 (E.D. Pa. Mar. 21, 2022); ("[F]ederal courts have not recognized a FMLA cause of action based on a hostile work environment." (collecting cases)); *Sturgis v. Diamond Hosp. Servs. LLC*, No. 24-241, 2026 WL 906745, at *8 n.5 (W.D. Pa. Apr. 2, 2026) (noting that "the FMLA does not provide for a 'hostile work environment' cause of action" (citation omitted)). Plaintiff's FMLA-based hostile work environment claim is, therefore, dismissed with prejudice.

meet the requirements of the PIP, [Plaintiff] fell far short of her sales quota and failed to log a single sales call into Labcorp's sales tracking software." (Def.'s Moving Br. 30-31 (citing DSOF ¶¶ 80, 86, 91, 99, 104, 119-24).) Here, however, there is a dispute of fact as to when the PIP was restarted (see, e.g., DSOF ¶ 99; PRSOF ¶ 99), but the parties agree that Plaintiff requested FMLA leave on September 22, 2022, which was subsequently approved on October 29, 2022 (see PSOF ¶ 147; DRSOF ¶ 147). Moreover, Hanshaw contacted Musser on September 30, 2022, after Plaintiff's FMLA request, to discuss Plaintiff's PIP. (See PSOF ¶ 153; DRSOF ¶ 153.) The decision to terminate Plaintiff was then made on November 17, 2022, which was less than two months after Plaintiff requested leave. (See PSOF ¶ 154; DROSF ¶ 154.)

The Court finds that a dispute of fact remains as to the reinstatement of the PIP, and that the timing of these events creates enough of an inference, for the purpose of summary judgment, that Plaintiff's termination could be discriminatory or retaliatory in nature. See, e.g., Santosuosso v. NovaCare Rehab., 462 F. Supp. 2d 590, 598 (D.N.J. 2006) (denying summary judgment on plaintiff's FMLA claim and noting that temporal proximity of "a little more than a month . . . creates an inference, for the purpose of deciding a motion for summary judgment, that her demotion, transfer, and termination could be retaliatory in nature"). Because Plaintiff has met her burden of establishing a prima facie case, and for the reasons discussed above regarding the remainder of the test under the McDonnell Douglas framework, Defendant's motion for summary judgment as to Plaintiff's FMLA claim premised on discrimination and retaliation is denied.

### D.    Counts Four through Seven (State Law Claims)

Plaintiff's SAC asserts claims under the NJLAD and NJFLA, as well as claims under the PHRA and PFPO pleaded in the alternative. (See SAC ¶¶ 190-220.)

27

### 1.    Counts Four and Five (NJLAD and NJFLA)

Defendant argues that Plaintiff's New Jersey state law claims "must be dismissed as a matter of law because Plaintiff was a Pennsylvania employee who lived, worked, and served clients in Pennsylvania." (Def.'s Moving Br. 36.) The Court agrees with Defendant for the reasons stated below.

An out-of-state individual who does not work in New Jersey may assert a cause of action under New Jersey state law "if the plaintiff can demonstrate that New Jersey has the 'most significant relationship' to . . . her claim." *Chinchilla v. Geodis Am., Inc.*, No. 23-1995, 2024 WL 943424, at *6 (D.N.J. Mar. 5, 2024) (citing *Calabotta v. Phibro Animal Health Corp.*, 213 A.2d 210, 214, 219-21 (N.J. Super. Ct. App. Div. 2019)). Under this analysis and to decide which State's law to apply, the Court must first consider whether a conflict exists between the two sets of law. *See id.* Here, there are "critical differences between NJLAD and PHRA[, including]: (1) NJLAD does not require exhaustion of administrative remedies before bringing suit, whereas PHRA does; (2) NJLAD allows for punitive damages, whereas PHRA does not; and (3) NJLAD allows for jury trials, whereas PHRA does not." *Id.* (citing *Martin v. Port Auth. Trans. Corp.*, No. 09-3165, 2010 WL 1257730, at *4 (D.N.J. Mar. 25, 2010)). "As such, a conflict is present because the application of [NJLAD and PHRA] could result in different outcomes." *Id.* (citing *Donovan v. W.R. Berkley Corp.*, 566 F. Supp. 3d 224, 231 (D.N.J. 2021)). Moreover, as the parties recognize, a conflict exists between New Jersey law and Pennsylvania law because New Jersey provides for a cause of action under the NJFLA, but Pennsylvania law does not offer such an equivalent. (*See* Def.'s Moving Br. 37; Pl.'s Opp'n Br. 32.)

Because a conflict between the state laws exists, the Court must turn to "the next step of the analysis and [should] consider[] how the Restatement's choice-of-law principles under

28

Sections 6, 145, and 146 inform the 'most-significant relationship test.'" *Chinchilla*, 2024 WL 943424, at *7 (first citing *Donovan*, 566 F. Supp. 3d at 233; and then citing *Calabotta*, 213 A.3d at 219). Section 146 of the Restatement provides that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, . . . some other state has a more significant relationship . . . ." Restatement (Second) of Conflict of Laws § 146 (1971). Pursuant to Section 6, factors relevant to the choice of the applicable law include:

> (a) the needs of the interstate and international systems[;]
> (b) the relevant policies of the forum[;]
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue[;]
> (d) the protection of justified expectations[;]
> (e) the basic policies underlying the particular field of law[;]
> (f) certainty, predictability and uniformity of result[;] and
> (g) ease in the determination and application of the law to be applied.

*Id.* § 6. Moreover, contacts "taken into account in applying the principles of [Section] 6" include: (1) the place of injury; (2) the place of the conduct causing the injury; (3) domicile, residence, nationality, place of incorporation, and place of residence of the parties; and (4) the place where the parties' relationship is centered. *Id.* § 145.

Here, Plaintiff argues that "[t]here is a [genuine] dispute as to the extent of Plaintiff's service of New Jersey customers." (Pl.'s Opp'n Br. 33 (citing PRSOF ¶¶ 7, 16, 17).) The record, however, shows that Plaintiff's claims are based upon conduct that occurred after she relocated and joined the Philadelphia sales division in 2017 (DSOF ¶ 7; PRSOF ¶ 7 (admitting Plaintiff joined the Philadelphia sales division in 2017).) Plaintiff claims that "she traveled to New Jersey for work reasons, specifically to meet with Ryker" (PRSOF ¶ 16), but admitted that "[s]he traveled to New Jersey less than once per month to meet with Ryker" (DSOF ¶ 18; PRSOF ¶ 18). Moreover, while Plaintiff denies that "[s]he did not service clients in New Jersey[,]" (DSOF ¶ 17; PRSOF

29

¶ 17), she does not present any evidence to rebut that fact, and admitted in her deposition that she resided in Pennsylvania and did not have any New Jersey clients (Ex. 2 to Barbatsuly Decl. 89:3-5 ("Q. At that point, your house was, physically, in Philadelphia, right? A. Mm-hmm."), 89:6-17 ("Q. . . . Did you ever go to any patient service centers in New Jersey to perform any of your job duties? A. . . . I mean, I never had any job responsibilities there. . . .")).

The Court, therefore, finds that Plaintiff has merely incidental connections to New Jersey, which do not rise to the level of contact required to sustain Plaintiff's claims brought under New Jersey law. *See, e.g., Peikin v. Kimmel & Silverman, P.C.*, 576 F. Supp. 2d 654, 658 (D.N.J. 2008) (finding NJLAD does not apply where Pennsylvania was the state of employment, even though plaintiff "worked on cases for New Jersey clients and frequently traveled to New Jersey" as she was based out of her Pennsylvania office); *Donovan*, 566 F. Supp. 3d at 236 ("That [p]laintiff worked in New Jersey on a 'semi-regular' basis does not outweigh the interest of New York to his claims. . . . [and] the interests of the parties favor the application of New York law as . . . [p]laintiff was employed in New York, worked in [d]efendants' New York Office, and resided in New York."). Rather, Pennsylvania has the most significant relationship to the claims, and therefore, Pennsylvania law applies. *See Chinchilla*, 2024 WL 943424, at *8 (noting plaintiff "cannot access relief through NJLAD" where "the application of the relevant Restatement factors demonstrates that Pennsylvania has the most significant relationship to this matter").

The Court, therefore, grants Defendant's motion for summary judgment as to Plaintiff's NJLAD and NJFLA claims. Plaintiff's NJLAD and NJFLA claims are dismissed with prejudice.

### 2.    *Counts Six and Seven (PHRA and PFPO)*

Because the Court has determined that Pennsylvania law applies, it now turns to Plaintiff's PHRA and PFPO claims.

### a. *PHRA*

Defendant argues that Plaintiff's PHRA claim[14] fails as a matter of law for the same reasons that Plaintiff's sex and disability discrimination, retaliation, and hostile work environment claims under Title VII or the ADA fail. (Def.'s Moving Br. 39.)

PHRA claims are analyzed under the same burden-shifting framework as Title VII and ADA claims. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 413 415 (3d Cir. 1999) (analyzing discrimination and retaliation claims pursuant to Title VII and PHRA under same *McDonnell Douglas* burden-shifting framework); *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220-21 (3d Cir. 2024) (analyzing ADA and PHRA claims under same framework). As a result, and for the reasons discussed above in the context of those claims, Defendant's motion for summary judgment as to Plaintiff's PHRA claim based on: (1) sex discrimination; and (2) disability discrimination and retaliation is denied.

### b. *PFPO*

Defendant argues that Plaintiff's PFPO claim fails because "[t]he Pennsylvania Supreme Court has made clear that the City of Philadelphia lacks authority to apply its ordinances beyond its city limits" and "[w]hile Plaintiff's employment was based in Philadelphia, her managers who made the challenged employment decisions were all based outside of Philadelphia." (Def.'s Moving Br. 39-40 (citations omitted).) The Court agrees.

Here, the undisputed facts show that incidents related to Plaintiff's claims arose outside of Philadelphia.[15] (*See, e.g.*, DSOF ¶ 18 ("[Plaintiff] traveled to New Jersey less than once per month

---

[14] Plaintiff alleges a claim pursuant to PHRA for "acts of discrimination and retaliation against Plaintiff" because "Plaintiff's sex, disability, and/or protected activity were motivating and/or determinative factors in the adverse actions taken against Plaintiff." (SAC ¶¶ 207-08.)

[15] The Court also notes that Plaintiff did not substantively dispute Defendant's arguments pertaining to the PFPO claim. (*See generally* Pl.'s Opp'n Br.)

to meet with Ryker."); PRSOF ¶ 18; DSOF ¶ 103 ("On June 28, 2022, Ryker met with Plaintiff at Labcorp's facility in Bristol, Pennsylvania . . . ."); PRSOF ¶ 103 (admitting occurrence and location of meeting); DSOF ¶ 111 ("On July 29, 2022, Plaintiff met with Epple at his office in New Castle, Delaware."); PRSOF ¶ 111 (admitting occurrence and location of meeting).) As "[e]xtra-territorial enforcement of the [PFPO] is precluded by the First Class Cities Home Rule Act, which bars cities of the first class, *i.e.*, Philadelphia, from 'exercis[ing] any powers or authority beyond the city limits[,]" the Court finds that enforcement of the PFPO for purposes of Plaintiff's claims is not permissible here. *See Se. Pa. Transp. Auth. v. City of Philadelphia*, 101 A.3d 79, 89 (Pa. 2014) (third alteration in original); *see also id.* (noting that the court is not aware of "any statute remotely suggesting the [PFPO] is viable outside of Philadelphia").

The Court, therefore, grants Defendant's motion for summary judgment as to Plaintiff's PFPO claim. Plaintiff's PFPO claim is dismissed with prejudice.

## IV.    CONCLUSION

Based on the foregoing, the Court grants in part and denies in part Defendant's motion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: June 30th, 2026